Collins v. Toppin.

MARY COLLINS, a lunatic, by JOHN KENNY, her next friend and brother,

v.

ANNIE TOPPIN.

[Submitted February 1st, 1903. Decided April 10th, 1903. Filed January 20th, 1904.]

In a suit to set aside a deed made without consideration by complainant to one occupying confidential and intimate relations towards her, evidence examined and *held* to show that complainant, at the time she made the deed, did not have sufficient mental capacity to know and judge of those things which enter into a proper disposition of property.

On final hearing on bill, answer and proofs.

*Mr. Charles L. Corbin,* for the complainant.

*Mr. George T. Werts,* for the defendant.

PITNEY, V. C.

The bill is filed for Mary Collins, a complete and incurable lunatic, by her brother, John Kenny, her next friend, against

Annie Toppin. The complainant and defendant are residents of Jersey City.

The cause, in its primary stage, has previously been before the court, as reported in *18 Dick. Ch. Rep. 381.*

The bill states that the complainant is the widow of Martin Collins, deceased, of Jersey City, who died on the 11th of October, 1900, at which time the complainant was seized jointly with her husband of certain valuable real estate in Jersey City, consisting of a large flat-house, known as the Florida flats, worth about $80,000, and subject to a mortgage of $45,000, and with a rental value of $8,000 or upwards, and which, after paying the current charges of interest, insurance and repairs, produced a comfortable income, and of which by the death of her husband she became seized in fee-simple.

That the complainant became insane, and was confined, at the instance of her husband, in the state hospital at Morris Plains, in the latter part of July, 1899, and that after several months she was taken from the hospital, at the request of her husband, and that she was afterwards again, in the latter part of September, 1900, committed to the insane asylum as insane. That she has no children.

That in December, 1900, her brother applied to the court of chancery to have the complainant adjudged a lunatic in order that a guardian might be appointed of her estate; that an inquest was taken, and that, although the physician in charge of the hospital and her family physician, Dr. McGill, and others, testified to her insanity, yet that two other physicians, officeholders in the county of Hudson, had testified to the contrary, and the jury found her to be of sound mind, and she was released from the asylum the latter part of January, 1901, and went to live with the defendant, Annie Toppin, and her sister, Lottie Toppin, at their house in Jersey City.

That in the summer of 1901 she was sent, by persons unknown to the complainant or her brother, to the Hudson county lunatic asylum for paupers, under the charge of Dr. King (one of the witnesses who had testified at the inquest in the previous January that she was sane), and that up to the filing of the

bill she had remained in the county hospital for paupers, under the charge of Dr. King, without the comforts and care to which she is entitled, and which could be secured by the proper use for her benefit of her estate.

That the defendant, Annie Toppin, with whom the complainant was living in the summer of 1901, claims to be the owner of all of the real estate of which the complainant became the owner by the death of her husband, and that one Robert Davis, of Jersey City, claims to own all her personal property under an assignment.

That there appears of record, in the office of the register of Hudson county, a deed purporting to be made by the complainant to Annie Toppin, dated June 4th, 1901, recorded June 11th, 1901, whereby, in consideration of $1, complainant conveys to the defendant, Annie Toppin, in fee-simple all the lands above mentioned.

The bill then alleges:

"At the time of the making of said deed your oratrix was not competent to make the same, nor has she been competent at any time since, and the same was fraudulently procured from her and is without consideration and null and void."

The prayer is that the deed be set aside, and that the defendant may be decreed to account for and pay over to the complainant the rents and profits that she has received.

The defendant, by her answer, admits the ownership of the premises by the complainant, but denies that the complainant was at any time insane, or that she was committed to the state hospital because of her insanity, and she says that any confinement that the complainant has undergone in the state hospital was voluntary on her part and for the sole purpose of enabling her to be treated for and recuperate and recover from the effects of her indulgence in intoxicating liquors and other stimulants, to which she was at times addicted.

She further admits the lunacy proceedings and the finding of the inquisition and alleges that the finding of the inquisition is conclusive, and denies, again, that the complainant was at

any time a lunatic, and alleges that at the time of the making and delivery of the deed to the defendant the complainant was in full possession of her faculties and capable and competent to transact any and all business, and that if the complainant became insane afterwards, which the defendant denies, such insanity must be from a very recent date.

She admits that the complainant lived at the house of the defendant and her sister during the time stated in the bill, but that it was a mere natural continuation of a previous intimacy and great attachment existing between the parties, and alleges that the complainant has been for a long time, and still is, estranged from her brother and next friend, and had declined to have any communication or relations with him.

She denies that in the summer or fall of 1901 the complainant was sent or committed to or confined in the Hudson county asylum, or that she was at any time in the insane ward of said asylum and without the comforts and care to which she was entitled.

But she alleges that complainant was a friend of Doctor King, who was aware of her disposition to use liquors and stimulants, and endeavored to overcome the same, and that for that purpose, in September, 1901, she voluntarily placed herself for a short time under the charge of Doctor King at his private residence or quarters at said Hudson county asylum, and while there had her freedom, her own private room, attendants and all proper care and attention.

The answer further says that the complainant was not at the date of the filing of the bill, nor has she since been at the said Hudson county asylum, or at the residence or quarters of said Doctor King, but does not state where she was at the time of filing the bill or the filing of the answer.

The defendant admits that she holds the deed in question, but knows nothing about the assignment by the complainant to Robert Davis. She explicitly denies that, at the time of the making of the deed, complainant was in anywise incompetent to make the same, or that it was fraudulently procured from her, or that it was without sufficient consideration. She says, at the time of the making of it, complainant was in all respects compe-

tent to make and execute the same, and that she understood and comprehended the nature of the transaction, and freely and voluntarily made, executed and delivered the deed without any fraud practiced on her by the defendant or any other person in her behalf, and entirely without restraint or influence by the defendant or anybody else.

The answer does not state any consideration for the deed, nor does it hint at or declare any trust upon which it was held by the defendant.

The proofs show, or tend to show, the following facts:

The complainant and her brother, the next of kin, were the children of respectable Irish parents, living in the city of New York, and were born and reared there. The brother seems to be a simple-minded, hard-working, sober and industrious mechanic, working for a weekly wage, living with his wife and family of children in an ordinary flat in the city of New York, having little or no experience in business affairs and to have accumulated little or no means.

The complainant was intelligent, but illiterate; she could read, but could write no more than her name. She was bred to the arranging of artificial flowers, and became an expert, so that she earned quite large wages.

Her husband, Martin Collins, was a cattle drover, dealer and slaughterer, with headquarters at Jersey City; he was an enterprising and thrifty man. They married some thirty years before the transaction in question. Her husband was a drinking man and occasionally drank to excess and went on sprees so as to render himself incompetent for several days at a time. The complainant was also in the habit of drinking beer and light beverages, but not to excess. The evidence of the physicians is clear that her mental disturbance was not due to drinking, nor was there any lesion of the brain due to that cause; in short, it was not a case of alcoholic insanity, although drinking may have at times been the immediate occasion of a fresh eruption of mental disturbance. It clearly appears that she had no craving for drink such as besets habitual drunkards. The evidence by defendants in support of the drink theory was much exaggerated.

Collins *v.* Toppin.

The complainant appears to have been born in the year 1850. In her early married life she assisted her husband in making money by working at her trade, and with the accumulations of their joint earnings they acquired, by joint conveyance, the land upon which the Florida flats are situate and borrowed money and erected the flats. The investment was a success and at the time covered by the transaction here brought in question the flats were in the hands of a very respectable and efficient real estate agent in Jersey City, who had them fully rented, attended to the repairs, and the payment of taxes, insurance and interest promptly, and there was left upwards of $2,000 per annum in income therefrom. Besides, when Martin Collins was actively engaged in business, · it must have produced a considerable income, for they lived in a comfortable, if not handsome, house in a respectable neighborhood, with a stable, and kept horses and carriages and four servants.

They had been on friendly, if not intimate, terms with her brother, John Kenny, and his wife and children. One of the latter frequently visited her aunt and spent considerable time at her house.

In the early summer of 1899 the complainant began to develop symptoms of insanity, and in July of that year she was committed to the lunatic asylum at Morris Plains on the regular certificate of Dr. John D. McGill and of Dr. Law, both of Jersey City, to the effect that the attack began on the 4th of July; was rapid in its onset, and was a general mental perversion and a complete reversal of her usual demeanor.

She remained in the asylum until the latter part of September, 1899, when she was taken away by her husband as improved, but not cured. They took as an attendant one of the hospital nurses. Her husband took her on a visit to Virginia and afterwards on a journey of several months to the south and west, returning to Jersey City February 12th, 1900.

In the summer of that year—1900—she again became insane, and, nominally on her husband's application, but really on that of his foreman, was, on the 26th of September, 1900, committed again to the Morris Plains asylum. There is little evidence as to her condition from February 12th to September, 1900.

Collins *v.* Toppin.

On October 11th, 1900, her husband died, and the funeral occurred on October 13th.

Her brother and his wife visited her on several occasions at the Morris Plains asylum.

The effect of her confinement and the regimen of the asylum was to ameliorate the violence of her mania and to render her entirely conscious and extremely desirous of being removed. Her brother was quite willing she should be removed, but the physicians at the asylum advised against it and would not permit it. They stated that she was not in a fit mental state for removal, whereupon her brother, taking the advice of counsel, applied to this court for a writ *de lunatico inquirendo,* the object being to determine her condition of mind, and if found insane to have a guardian appointed, and then remove her and put her under the care of a proper caretaker in a private house, where she would be comfortable. The petition for the writ was supported by the affidavit of Dr. Evans, of the asylum, and of Dr. Schultes and Dr. Bauer, of New York. The writ was issued and a hearing was fixed for January 8th, which was postponed to January 12th. The return recites a hearing of January 12th and 16th, and a finding that Mary Collins, at the time of the taking of the inquisition, is of sound mind. The inquisition sat in Jersey City, and the complainant was brought to Jersey City by an attendant of the asylum and was seen by Dr. Converse, the county physician of Hudson county, and Dr. King, the superintendent of the county pauper lunatic asylum. Dr. McGill and Dr. Evans both testified, the latter quite positively and strongly, that she was not yet recovered. The contrary was testified to by Dr. Converse and Dr. King, and the jury found as I have stated.

The return of the inquisition was confirmed and on January 23d, 1901, the complainant was delivered to Mr. N., as her counsel, who signed a receipt for her and brought her immediately to Jersey City and delivered her to the defendant, Miss Toppin, where she remained until about the 15th day of July following.

In the meantime, the rents of the Florida flats had been col-

lected by the same real estate agent in whose charge it had been put by Martin Collins in his lifetime. Letters of administration had also been taken out on his estate soon after his decease by Robert O. Babbitt, who placed the affairs of the estate in the hands of Mr. McCrea, of the Hudson county bar.

On the 31st of January, a week after her return from the asylum, she executed, in the presence of the defendant and a Mr. Holden, one of the masters of this court, a most comprehensive and sweeping power of attorney to Mr. Robert Davis, of Jersey City, commonly called Sheriff Davis, then city collector, in which she placed under his control, as her agent and attorney, all her real estate, with power to rent and deal with it in all respects as she could herself; to mortgage it for the purpose of paying off the present mortgage, and, at his discretion, grant, bargain and sell and convey the same for such price and at such terms as to him may seem fit, and to make delivery of such conveyance in her name. Also, to look after her share of her husband's estate and the large arrears of rent of her share of the real estate taken by his administrator. Also other rent moneys accruing due prior to the rents mentioned. Also a claim against her husband's estate for $3,000, for money loaned. To collect and receive her share for her of her rent moneys and her rent, and to bring suit or suits therefor, to give a quittance and discharge therefor, and to prepare an inventory of her husband's estate, and to invest the proceeds of those proceedings on bond and mortgage on real estate and such other bonds as he may think best. And then proceeds:

"After paying over to me out of such rents, issues and profits and said other moneys from time to time, not oftener than once a month, such sums as I may need and request for my own purposes and uses, I absolutely assign to him my said share of the rent moneys and claim in consideration of one dollar and other valuable and sufficient consideration, and make him my attorney irrevocable to sue in his name therefor."

On the 4th of June she executed the deed here in question, which was prepared by Mr. N., her counsel, and delivered to the defendant. At no time was any consideration in money paid therefor.

She had several interviews with Mr. N. with regard to the execution of the deed prior thereto, always with, I believe, one exception, in the presence of the defendant, Annie Toppin, and who was also present at the time of its execution.

She continued to reside with the defendant until about the 15th of July, 1901, when she was taken by the defendant to a hotel or boarding-house in Rockaway, on Long Island, and left there, alone, without attendance.

Without now stating what occurred between that time and about the 19th of August, a period which covers events of considerable importance and will be hereafter referred to, she was found on that day—August 19th—by the police wandering about the city of Brooklyn, alone, in a pitiable condition, and was placed in the station-house and there kept over night. She had sufficient consciousness to ask the police to telephone to Mr. Robert Davis, at the city hall, Jersey City, which they did, with the result that Miss Lottie Toppin, sister of the defendant, went to Brooklyn and brought her in a carriage and placed her in a private sanitarium for persons laboring under the effect of excessive stimulants, somewhere on the Hill in Jersey City. Just what happened there does not clearly appear, except that she was suffering from mania. The proprietors of the sanitarium were unable to confine her and she escaped and came to the house of the defendant in her absence, and her sister, Lottie, immediately took proceedings to have her committed—August 26th, 1901—to the county pauper asylum as a paying patient at $5 a week.

She sometimes was fed from the table of Dr. King, but the undoubted facts are that she was confined in a room, usually occupied by pauper patients, without special attendance, and received little, if any, more attention than that of an ordinary pauper.

Later on her brother learned of her condition and location and went to see her on more than one occasion, and she begged to be taken away.

He employed counsel, ascertained the conveyance to be of record and heard of her assignment to Davis, which was not

recorded, with the result that the bill in this cause was filed on the 6th of January, 1902.

It was supposed by counsel that at that time she was still in the county asylum and, as before stated, the answer in the case gives the complainant no information on that subject except to deny that she was there.

The result of the last visit of her brother to her at that place was to excite Dr. King to write to Mr. Davis that she should be taken away, and she was removed December 30th, 1901, to a respectable and comfortable private asylum in the city of Paterson, where she has remained ever since, and is undoubtedly a hopeless lunatic, in fact quite demented.

This brings us to the first important matter to be considered, namely, the mental capacity of the complainant at the time the deed in question was executed.

In considering this we start out with the glaring fact that the complainant had been afflicted with mental disorder, commencing as early, at least, as July 1st, 1899, and continuing indefinitely in that year. She was, as we have seen, committed to the asylum on the 22d of July, 1899, and was taken out under the care of a nurse and went with her husband to Virginia in the latter part of September in that year, and from Virginia went with him to Kansas City, arriving home on February 12th, 1900. There is no evidence as to her condition during all the time she was absent from the state. The nurse who accompanied her was not called, and there is very little evidence as to her condition from February 12th, the day of her return, until she was recommitted to the asylum on the 26th of September, 1900.

Some little time, how long it does not appear, before she was so committed a second time to the asylum, her husband went on a spree and she was taken to the hospital by his clerk, Cahill, and the defendant. The application bears the signature of M. Collins, but that was probably written by the clerk.

The affidavit to this commitment made by Dr. McGill states that the present attack commenced on September 1st, was gradual and was caused by "mental worry." And as to the use of intoxicants says, "moderate use of liquor—lately uses

none." All this information was, of course, obtained by Dr. McGill second hand.

. She was at all times entirely conscious, knew her friends and her location and had memory, &c., but was mentally unbalanced and subject to several delusions. She soon improved under proper treatment and quiet. Her delusions began to fade and by the beginning of 1901 had all, or nearly all, vanished and her mind became calm and apparently sensible. This condition continued until August, 1901, when she relapsed, and on this third occasion the relapse was permanent and her condition soon reached the stage of dementia.

This final result compels us to look with great care at her condition during the period when it is alleged she was enjoying what is called a lucid interval, namely, from February 1st to August 1st, 1901. It was during the early part of this period that the conveyance here in question was devised and completed.

In examining her mental capacity during that period, we naturally expect, after what she had suffered, to find her mind more or less enfeebled in all directions, but especially in the exercise of the higher mental functions of reason and judgment. And we must bear in mind that a person may be quite capable of transacting the ordinary routine business affairs of life with accuracy and safety and yet not quite capable of taking care of himself or herself in more important and weighty matters requiring careful examination and discernment, judicious consideration and sound judgment. Hence we may very well believe that the complainant was quite capable of receiving her rents from the real estate agents in charge of her property and disbursing it with safety in the supply of her own needs and the gratification of her benevolent and friendly feelings, and yet conclude that she was incapable of making a complete and final disposition of her property, such as is here in question.

This distinction was well understood by some of the learned physicians who assisted me with their opinions. Commencing with Dr. Evans of the asylum, who is expert, of course, in these matters and who had seen very much more of the complainant than any of the others, he testified that on her second commit-

ment in 1900 her condition was more pronounced and her insanity more fully developed than on her first. And here I mention a rather important symptom stated by the doctor, namely, her great generosity to all those around her, who humored her and obeyed her behests, and great aversion to those who in any way opposed her wishes.

As to her mental condition on January 12th, 1901, when he testified before the inquisition at Jersey City, and on January 23d, 1901, when she was delivered by him to Mr. N., he swears that she was not, in his opinion, competent to transact important business. He swears she had no lucid intervals while under his care; that she might have periods, as she did while in the institution, when she was clearer, calmer and better able to understand the situation, but he had never seen her when she was in the possession of her faculties. He swears:

"She was thoroughly unstable and unreliable in anything that pertained to important business transactions, the last time I saw her.

"*Q.* You didn't think it was a hopeful case?

"*A.* I didn't look upon it as a hopeful case; I looked upon it as one of those cases that might improve, but she would never have perfect mental stability.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"*Q.* When she took a fancy she would give anything?

"*A.* And it didn't take long to take a fancy, either.

"*Q.* In your opinion, was she safe custodian of her own property?

"*A.* In my opinion, she was not; one of the most unsafe persons that has ever come under my care."

And he declares that such was her condition when she was before the commission in Jersey City and when she left the asylum. At the same time he swears that a casual observer, or an inexperienced physician, might, upon a single examination, have pronounced her sane. Pressed on cross-examination, he said:

"Alcohol might have been the immediate cause of an outbreak, but the foundation, the basis, the predisposing cause of it all, was an unstable and diseased balance of the central nervous system."

I now come to the evidence of Dr. John D. McGill, a well-known physician of high standing in Jersey City, who had been

a sort of family physician for the complainant and her husband. He was first called in and saw her several times in July, 1899, before she was first taken to the asylum, and considered her unsafe and advised that she be sent to the asylum. He did not see her from that time until a little over a year later, to wit, September 26th, 1900. He then found her in the same condition she previously was—suffering from mania, with delusions. He next saw her in January, 1901, at the time she was at the Washington hotel in Jersey City and the lunacy commission was in session. He said that she then appeared much improved over what he had seen before and apparently in possession of her normal faculties; that she answered his questions coherently and rationally, and that his conclusion as to her condition was that "she had a lucid interval in the course of her disease—mania, which I regarded as more or less chronic with periods of where the disease would be in abeyance, in which she would be apparently in normal condition." He says:

"She was apparently in such normal condition, and, to a person absolutely ignorant of her history, and to a person absolutely ignorant of morbid psychology, she would be apparently sane.

"*Q.* As a matter of fact, what did you think about her condition?

"*A.* She was apparently at that time sane; my opinion was that while apparently sane, her mind was not competent for the purpose, we will say, of testamentary capacity, anything of that kind—that is, she hadn't a truly psychological mind.

"*Q.* Wasn't fit to attend to business?

"*A.* She would not have a rational understanding or knowledge of her affairs, or a rational conception of their disposal."

On cross-examination, asked in regard to the effect of alcohol, he says he recollects that on the second occasion alcohol was somewhat of a factor and that worry over her husband's condition was also a factor: "I think very possibly that both of these were factors in causing this outburst." But, further pressed, he says:

"I would say emphatically, here, that I didn't then, nor don't now, consider that that was a case of alcoholism or alcoholia; I considered that that was a case, pure and simple, of mania; that the use of alcohol and mental anxiety over her husband's condition may have been factors, but the disease itself produced her mania, accompanied with delusions, showing that it was true aberration of the mind."

And he said he could not· say truthfully that he considered this lady had a stable·mind at any time. And further on he says: "That while she might˙have enjoyed lucid intervals, she was not fit to transact·important business." Further he states that her condition was such at the time he saw her at the Washington hotel, in January, 1901, that her becoming insane afterwards was what he might expect; "she might have been insane a half hour after I left her;" and he swears that it was his opinion that he could not believe that she was competent for testamentary capacity. And he gives his conception of what testamentary capacity is; and that in his opinion, from the first time he committed her to the asylum, she never had testamentary capacity; and he said this:

"A person, to comprehend the nature of a will or anything of that kind, must have what might be called psychic logic; a person like Mrs. Collins, after she developed mania, never had the necessary psychic logic to comprehend a will. There is a difference between the nerve centres and the brain, between the ordinary effect of so-called memorizing centres where memory plays˙an important part in the action of the individual, that is one thing, and requires a lower rate of mental power. *Now, the higher rate of mental power, using judgment located in the higher intellectual centres, in a condition of this kind, would be blunted and impossible to use normally, as it would in a perfectly sane person; that is my idea of it.*"

And asked this question:

"*Q.* Do you mean to say that on this day, when you talked with her at the Washington hotel, if she had intended to draw a will on that day, that she could not have comprehended the nature of a will?
"*A.* I think not; that is my opinion.
"*Q.* Nor the persons upon whom she wished to bestow her bounty?
"*A.* I would distrust it.
"*Q.* What would lead you to distrust it?
"*A.* Simply my experience in the study of the disease and her history in connection with that disease; her condition was one of recurring attack of active mania, and then apparently lucid intervals."

Afterwards Dr. McGill was recalled and I ,put to him the categorical question found in the opinion of Justice Kirkpatrick in *2 South. 661, 662,* \**664,* which since, as I understand it, has been in substance adopted by the court of errors and

appeals in the recent case of *Thorp* v. *Smith, 20 Dick. Ch. Rep. 400*. The question I put was, did she, the last time he saw her, have a "mind capable clearly to discern and discreetly to judge of all those things and all those circumstances which enter into the nature of a rational, fair and just testament;" and he answered in the negative and said, "She could not clearly discern or discreetly judge." The same question was afterwards put to Dr. Evans and produced a similar answer, and he was asked particularly as to whether he distinguished between the ordinary faculties of memory and perception and the higher faculty of judgment, which includes balancing and weighing, and he said he did; and then he was asked

"Whether, from her previous history and nature of the disease with which she was afflicted, it was probable that she could ever attain a degree of judgment that would enable her to transact important business, including the value of her property, and to know what was best to do with it?"

And his answer was that he did not believe it then, and he has no reason to change his opinion; that her mind was of such an uncertain character—her equilibrium was seriously disturbed by the disease, such mental disease known as insanity, unsound mind, mental derangement and so on—was so unbalanced and so uncertain in its character and its movements and its manner of approaching a subject in its various parts and coming to a conclusion and judgment that she was incapable of arriving at a logical and clear judgment upon any subject of great importance, such as entering into a large business transaction that is out of the ordinary trifling character—such as becomes routine in a person's life and even a person, a senile dement, may carry on in a mechanical way.

We come now to the evidence of Dr. Converse, county physician, and Dr. King, superintendent of the county lunatic asylum, which is relied upon to sustain the complainant's mental balance.

Dr. Converse swears that he had an interview with her at the Hotel Washington, Jersey City, on the occasion of the lunacy inquisition, and that he had a list of the delusions under which

she had labored while in the asylum, furnished by Dr. Evans to Mr. N., and found that her delusions, so far as they were contained in the list, had vanished, and he thought that she conducted herself in a perfectly natural manner, and he saw no evidence of insanity at that time. Then asked by counsel of defendant:

"*Q.* Then the opinion that you formed was what?

"*A.* Was that she was in a condition that was normal of health at that time.

"*Q.* And as to engaging in any business transaction and understanding the nature of that?

"*A. That is not a medical question, I should think.*

"*Q.* (By the court.) *Did you occupy yourself with that thought at all?*

"*A. No, sir, I did not.*

"*Q.* (By the court.) *You didn't examine her with a view to see whether she could transact important business?*

"*A. No, sir; I examined her to see whether she was insane in the sense that she ought to be kept in an asylum or not.*

"*Q.* And the conclusion you came to——

"*A. Was that she was as well able to be out at that time as she ever was, probably.*"

He next saw her at the Snake Hill pauper asylum on August 28th, 1901. He does not attempt to account for the change in her between the time he saw her in January, at the Hotel Washington, and the next August at the Snake Hill hospital. In answer to a pointed question he says:

"*A.* I don't account for it at all; I don't try to account for it; it was an observed fact; I saw there was a change.

"*Q.* Whether it was the natural growth of the disease?

"*A. I think it was due to natural development of the disease.*"

The inference I draw from the evidence of this witness is that she was, at the time he saw her, at the Hotel Washington, still afflicted with mental disease, which finally developed into settled insanity, and, further, that his avoiding the question of business capacity is significant, to say the least.

Dr. King, superintendent of the pauper insane asylum, swears that he went with Mr. N. and ex-sheriff Heintze to Morris Plains to see the complainant some time early in January, 1901

—a short time before the sitting of the inquisition; that he had a list of her delusions and questioned her about them, and found she had every appearance of a person who was, at that time, restored to mental soundness, but at the same time recollected that the delusions did exist at one time. She was conscious that her mind, at one time, was not right, but she thought then that she was better.

Next he saw her at the Hotel Washington, on the occasion of the inquisition, and said that he again examined her on her delusions and found that they had vanished and that she had every appearance, at that time, of a person who was of sound mental health. This question was put to him:

"*Q.* In your opinion, was she capable of transacting business and understanding business transactions?

"*A.* I thought so; yes, sir."

Then, the next time he saw her was when she was brought to the Snake Hill asylum. He says, in answer to a question put by the court on the subject of the effect of drink, viz.:

"*Q.* If her mental disorder was due to too much drink, you would expect she would get well, wouldn't you, after the drink was taken away?

"*A.* Yes, sir.

"*Q.* (By the court.) But she has not?

"*A.* She has not.

"*Q.* (By the court.) The evidence here to-day satisfies my mind, up to date, subject to what may be said, that it is progressing and running into dementia; now, what effect does that have on your diagnosis of the original cause?

"*A.* The only effect was she has had two previous attacks of this disease, and, *of course, any person going through any state of mental excitement like that, they are more or less injured; one attack is going to hurt anybody, and if they have two attacks or three attacks, then there will be a brain lesion, superinduced by that condition.*

"*Q.* (By the court.) Now, your notion is that there was a brain lesion already due to the two attacks she had before you saw her at the Washington hotel—more or less brain lesions, there must have been?

"*A.* I think there is a brain lesion now.

"*Q.* (By the court.) No, but at that time there was a brain lesion?

"*A.* When I examined her at the inquisition."

But afterward he declined to admit that he thought there was a brain lesion at the time he saw her at the Washington hotel.

However, the force and effect of this witness' evidence, so far as it goes, is much affected by what I am satisfied he afterwards stated about the case.

Mr. Kenny, the complainant's brother, did not hear of his sister's confinement in the Snake Hill sanitarium until several weeks after she had been there, and then only by accident. As soon as practicable, after learning her whereabouts, he called there with a friend, a Mr. Frank, and saw his sister. She knew him; was delighted to see him; put her arms around his neck and kissed him and begged to be taken away. He had not then heard of the conveyance here in question, but immediately sought Mr. McCrea, whom he had met in connection with the administration of Martin Collins' estate, and with him concerted measures for the relief of his sister. Of course, the money question was important in that connection, and the record of the conveyance was found. Mr. Kenny then again visited the asylum with his friend, Mr. Frank, and again had an interview with his sister in her room. After he came therefrom, he, in the presence of Mr. Frank, fell into conversation with Dr. King about his sister's condition and the deed of conveyance, of which he had learned since his previous visit. Dr. King said to Kenny with regard to his sister's mental condition, as both Kenny and Frank testified, "I thought you were wrong, but I see you were right." And with regard to the deed he said, "I don't see how the verdict can stand—it is impossible." Dr. King denies this conversation, but I see no reason to doubt its truth. Mr. Frank seemed to be a decent artisan and I think neither Kenny nor he were capable of manufacturing such a story.

Dr. King was not examined as to her testamentary capacity, and it does not appear that when he saw her at Morris Plains, or at the Hotel Washington, Jersey City, that he arrived at the conclusion that she had attained any more than that degree of mental calmness which rendered it proper that she should be at large.

This review of the medical evidence tends clearly to establish the position, in connection with the admitted facts of the case, that the complainant did not have, when she was discharged from

the asylum the last time, that degree of mental capacity which is sufficient to sustain a transaction like that here in question.

And right here, in confirmation of that view and as evidencing a self-consciousness on her part that she was not fit to attend to business, we have the remarkable power of attorney and assignment, of which I have already spoken, executed within a week after her return from the asylum the last time. It was well remarked by counsel for the complainant that the power which she gave by this instrument to Mr. Davis over her property was greater than that of a guardian appointed by the court after an inquisition finding her not of sound mind.

But it is said that her mental condition improved after the date of that instrument and that, by the time this deed was executed, she was of complete mental soundness. Evidence to that effect is given by Mr. N. and other inexpert witnesses and is entitled to weight on the main question.

With regard to the theory of the defendant that the complainant's insanity was due to drink, there is a piece of evidence in the case that is quite significant. It appears that Mr. Cahill, Collins' superintendent at the abattoir, had a draft for $500 drawn on the concern by Mr. Collins, at Kansas City, early in February, 1900, and became convinced that Mr. Collins was on one of his sprees there, and immediately took the responsibility of going out to Kansas City and looking after him. He swears that he found him and his wife there—both drunk; that he, by strategy, managed to get them on the train and to get them to Jersey City; that they both drank all the time on the two days' or more journey and were continuously drunk.

Now it appears, from the evidence of the Misses Toppin, that the complainant was entirely in her right mind the evening after her arrival and the next day, when she went shopping with Lottie Toppin in New York and bought certain furs, which figure in the case. Although no direct evidence upon the subject is given, if the intimacy which is claimed by the defendant and her sister existed with the complainant, they must have had an opportunity to observe and know if this severe spree which she had with her husband in anywise affected her mind, and if such

had been the case it seems fair to presume that evidence would have been given on that subject; but, so far as the evidence shows, it had no such effect, and she remained at home until her husband got on a spree the next September, and while he was off from home on this spree she was taken to the asylum by Mr. Cahill and the defendant.

The naturalness of the disposition which she made of her property by the two instruments is attempted to be sustained by proof that, at the time the deed was made, she had a violent dislike and distrust of her brother and had declared that he should not have one cent of her property. And I think it worth while to deal with that subject at this stage of the discussion.

The fact is that, although by the prosperity of herself and her husband, she had attained to a style of living quite superior to that of her brother, yet her natural affection for him and the usual intimacy between brother and sister seems not to have abated. It is quite clear that they were on intimate terms and that she had the kindliest feeling toward him and his wife and children. But when her husband finally was advised by Dr. McGill, in July, 1899, that she must be confined in a hospital, her husband called on his brother-in-law Kenny and asked him to assist him in that matter, and Kenny did so. He first sent his wife over to Collins' house, in the morning of a Wednesday, and he followed after he had finished his day's work, and left his wife there and returned home, and then the next Saturday went with his sister and his wife and Mr. Collins to the asylum at Morris Plains. Collins afterwards told Kenny, so Kenny swears, that his wife was displeased with her brother, because he (Collins) had laid the blame of taking her to the asylum on Kenny in order to shift it from his own shoulders, and here is the first start of any feeling on the part of the complainant against her brother. He went once or twice, while she was at the asylum on this first occasion, to visit her, and his wife also went there. She was anxious to be removed, and Kenny sympathized with her and requested her husband to remove her, which he promised to do, but hesitated and postponed action. Kenny persisted in urging her removal and finally succeeded

in procuring Collins to take her home and go on the visit to Virginia and the journey in the southwest and west.

It does not appear that either Kenny or his wife saw her after she came back from the south, nor did he know of her being taken to the asylum on the 26th of September, 1900, until he learned it fifteen days later, at the side of her husband's deathbed. He and his family were summoned to come to Collins' house the day before he died. He, Kenny, went on the afternoon of the 10th, as Collins died early on the morning of the 11th. His wife and two of his children came the afternoon of the 11th, and all stayed at the house until after the funeral. There seems to have been a continual wake from the time the corpse was prepared for burial until the funeral took place. The house was full of people most of the time, and was left in a state of decided disorder.

Sheriff Davis, who was a friend of Collins, took the precaution to have the chief of police send a couple of policemen to the house to take charge of it as the funeral cortege left the house, and no person was permitted to enter it afterwards until it was taken charge of by the administrator of Martin Collins. The result was that Mr. Collins' nieces, the daughters of his sister, Mrs. Bolger, were prevented from getting possession of some outside wraps which they had left in the house when they started for the funeral. I mention this at this time because it has considerable importance on the question which I am now considering.

Among those who were at the house during the period, that is, from the death to the burial of Martin Collins, were both the Misses Toppin and other intimate friends and employes of Mr. Collins. On that occasion Mr. Kenny learned, as we have seen, that his sister was again in the asylum, and as soon thereafter as he could afford to leave his work he went to see her at Morris Plains; his wife also visited her there from time to time. She knew them all and was extremely anxious to be discharged from her present confinement, but in the opinion of everybody at that time—the month of November—she was unfit to come out. Miss Toppin, the defendant, also visited her from time to time.

Her brother promised to do what he could to get her out, and it appears, by the affidavits annexed to the petition for the inquisition of lunacy, that he sent two New York experts out there to see her, and they, as well as Dr. Evans, the physician in charge, agreed that she was unfit to be removed. He then consulted Mr. McCrea, who was acting as administrator of her husband. Mr. McCrea went to see her and the plan was devised of having an inquisition of lunacy sit upon her, and if found insane, have a guardian appointed who would have power to remove her, which, it is hardly necessary to say, her brother or any other person had not.

I find that the inspection of the two New York doctors was made on October 25th, only thirteen days after, the death of Mr. Collins; that the affidavit of Dr. Evans, annexed to the petition, was made on the 10th of December and that of Mr. Kenny on the 15th of December; that the petition was filed and an order for a commission made on the 17th of December. The commission was issued on the 19th. The warrant by the commissioners to the sheriff was dated on the 21st of December, returnable on the 8th of January, and afterwards postponed to January 12th, and on December 26th notice of the commission was served on the lunatic, and the commission sat on the 12th and 16th. During all this time, of course, the result of the treatment and regimen at the asylum had the effect of ameliorating the symptoms of her disease.

Now, it is impossible for anybody to imagine any kinder and more rational proceeding to be taken by the brother under these circumstances than what he did take. If she was found sane by the commission, then she would be entitled to be released; if, on the contrary, she was found, as all the doctors supposed her to be, insane, then a guardian would be appointed who would have power not only to take her out of the asylum, but to use the income of the estate in supporting her comfortably in a proper manner.

The defendant, Miss Toppin, was visiting the asylum frequently and she came there after the service of the notice on the complainant and took that notice to Jersey City and handed

it to Sheriff Davis, who immediately employed Mr. N. to defend
the complainant before the commission. Mr. N. visited the
asylum with Dr. King and ex-Sheriff Heintze, with the result
before stated. Mr. N. and Miss Toppin both swear that the
complainant was very bitter against her brother and charged
him with being the cause of her being detained in the asylum.
And Mr. N. says that he reasoned with her somewhat on the sub-
ject and said that she ought not to be too sure of that, &c.; but
it does not appear that he used those arguments, which, it is to
be presumed, if she was in her right mind, would have convinced
her of her error, namely, that the proceeding taken by her brother
was a proper and kind proceeding and one that would result in
her release and in fact was the only mode of releasing her ex-
cept a *habeas corpus.* And the fact that she retained that
dislike of her brother in the face of whatever attempts Mr. N.
made to rectify her on that subject seems to me to be an indica-
tion of an unsound mind, however natural it may be for a person
whose mind was slightly disturbed.

Her brother was at the inquisition only one day, but she did
not see him as she was not taken before the jury. At the finish
of the inquest she was, as I have said, taken back to Morris
Plains and then brought down again on the 23d of January and
went immediately to live with the defendant, Miss Toppin, in
her house with her family, composed of her mother and herself
and one or two sisters.

Now comes the most painful part of the case. On the 26th
of January Mr. Kenny received, at his house in New York City,
a letter dated on the 25th of January, written in lead pencil,
in a female handwriting and evidently that of a person somewhat
skilled with the pen but not in the use of English. It is in
these words:

"JERSEY CITY, Jan. 25, 1901.

"*Mr. Kenny:*

"Your sister Mrs. Martin Collins is home since Tuesday. I have been
to my dear husband's grave and my dear good friends picked a beautiful
spot for him which gladdened my heart and to think they thought of me
when I was in that terrible place I went to my house to get my furs
that was hanging on the gas jet in my close room and my muff was in
the box in the closet and they are no more to be found and you having

charge of the house I ask you if you know anything about them if you do let me know. I have three witnes to prove they saw them there.

"If you don't let me know I will see further I won one case and I will win this no more from

"MRS. MARTIN COLLINS.

"Send answer to Mrs. Martin Collins,
"124 Sussex street, Jersey City, N. J."

This letter is not in the handwriting of Mrs. Collins, nor is it in the handwriting of the defendant, but that it was written at the defendant's house and that either Mrs. Collins or some one who knew all the circumstances was the author of it there can be no doubt. The defendant disclaims all knowledge of it. Her sister Lottie was not inquired of on the subject.

The allusion to the furs opens up quite a subject. It is testified to by Miss Lottie Toppin that on the day after the complainant's return with her husband from Kansas City—at the end of the journey which succeeded her first incarceration, to wit, on the 13th day of February, 1900—she had been stopping over night with the complainant at the complainant's house; that her husband gave her $100 to go shopping with, and that she and Miss Lottie went to New York shopping, and among other things bought a fur muff and a fur tippet, and that the complainant wore them home; that when the season came for storing her furs she stored only her fur jacket, kept at home this tippet and the muff, and that they were in the house at the time of the death and funeral of Martin Collins. No other person except the defendant saw them on that occasion. The defendant swears that the muff was in a muff box, with the lid off, standing on a trunk or box in a room called a closet, which was not a closet but an extension of an upper bedroom, communicating with it by an arch passageway, without a door, and that the neck-fur or tippet was hanging on a gas-jet in that storeroom; that she saw it there during the wake and on the day of the funeral.

Both Mr. N. and Miss Toppin, the defendant, swore that, on the day after the complainant's return from the asylum, which would make it the 24th of January and the day before the offensive letter just recited was written, they visited the house,

Collins *v.* Toppin.

found a man there in charge, who had been put there by Mr. McCrea, acting for the administrator (and upon reasons which he explains with perfect satisfaction to the court, namely, that it was supposed none of the furniture in the house belonged to Martin Collins, and that the complainant being at that time incapax, with no one representing her, he felt it his duty to place a man in charge, which he did). When Mr. N. and the complainant and the defendant arrived at the house they found this man in charge, and complainant immediately charged that he had on a pair of her husband's trousers, which, in the light of all the evidence, seems to have been absurd. They found the house in the same terrible condition as it was found by Mr. McCrea when he took possession. It looked as if it had been robbed and ransacked from top to bottom. And it is proper to say here, upon such appearance and the report that things had been stolen therefrom, Mr. McCrea had, immediately after he took possession for the administrator, instituted an investigation, first on his own account and afterwards by the police of Jersey City, to see if they could get on track of the person who had looted the house, and all without any success.

But, returning to the 24th of January, when the complainant and Mr. N. and the defendant reached the room or closet where the fur was supposed to be hanging on the gas-jet, the complainant asked for her fur and immediately exclaimed that the Kennys had stolen it. (I have said that it was looked for on the gas-jet, where it was said to have been hanging, but, as I interpret Mr. Noonan's evidence, he understood it was looked for in a closet which was locked—a receptacle not at all corresponding with the evidence of the defendant.)

Now, considerable evidence was gone into on that subject with the result that there is not the least reason to suspect that they had taken it. They all deny having seen anything of it at the time and, as before remarked, the defendant is the only person who testified to having seen it, and the Kennys were not able to enter the house after the funeral.

But the defendant testifies that at one of her visits at Morris Plains the furs in question were the subject of conversation

---

---

between her and the complainant. Now the question arises, what suggested to the mind of the complainant that her brother's children had stolen that tippet? . I have given all the foundation there is for the notion that the Kennys had stolen her furs which led to the ridiculous and at the same time offensive charge in the letter above set out, written the next day.

That letter and the information that the Kenny family received that the complainant was living with the Toppins discouraged any efforts on the part of the brother to make friends with his sister, and, as before remarked, he knew little or nothing of her movements until he heard that she was in the Snake Hill lunatic asylum.

Now, the conclusion I draw from the matter of the furs is that either her mind had been poisoned against her brother and his wife and family by a suggestion made by someone to her that they had stolen her furs, or her mind was still unbalanced and the notion was a pure insane delusion.

These notions, first, that her brother was responsible for her continuance in the asylum and her entire misconception of his conduct in the matter of the lunacy proceedings, and second, her notion that he, or someone of his family, had stolen her furs, are put forward as the foundation of her dislike to her brother. She was, however, as we shall see further on, entirely disabused of them when he visited her at the Snake Hill asylum a considerable time after that.

I come now to the deed itself and the circumstances attending its execution. Mr. N., though employed originally by Sheriff Davis, seems to have been accepted by the complainant as her counsel. He nevertheless especially provided in the power of attorney, which he prepared and had executed, for his compensation in the matter of the lunacy proceedings and the other incidental services up to date.

He swears that on his way down in the train from the asylum with the complainant, she spoke to him about making her will and asked what the expense would be, and he stated if it was a simple will it would not be much, but if there were any trusts in it it might cost a good deal of money—as high as perhaps $200. It will thus be seen that the idea of writing out

a provision for a trust was accompanied in the mind of the complainant with a large item of expense. She objected to that and expressed her objection to him. He further testifies—and he gave his evidence, called by the defendant, with great elaborateness and precision—that she was a frequent visitor at his office in the spring of 1901; that she early broached the subject of making some settlement of her property; that she wished to provide against a recurrence of her previous attack, and she wished Miss Toppin, in such case, to take care of her, and talked with him as to how she could effect her desire. She visited the office frequently, always with Miss Toppin except on one occasion when he particularly requested over the 'phone that she should come alone; that she never seemed to have in her mind any precise and definite idea of just what provisions she did wish to make, but she did wish the property put in trust, so that in case she was taken ill the defendant could take care of her, and she expressed a desire that the defendant should be her beneficiary after her death and that her brother should have none of her property. Mr. N., at one time, attempted to commit her wishes to writing and to prepare a paper expressing the nature of the trust which she wished. The writing was lost and not produced and none was ever signed.

He also wrote a long letter on the subject to Mr. Davis, besides talking with him about it, because he says he knew Mr. Davis was her particular friend and confidant and she had put all her affairs in his hands. That letter was not put in evidence, but a copy was used as a memorandum from which he testified as to what her wishes were, and I infer from it that he wished to acquaint Sheriff Davis with the state of affairs so that Sheriff Davis could advise her as to what she should do in the premises. His preliminary consultations and conferences went on for a considerable length of time, and finally she ordered him to make a simple deed from her to Miss Toppin. He says that he told her what the effect of it would be; *that in case anything happened to her, the complainant,* the effect of a deed would be that Annie Toppin would get all the property. He is quite sure that he made that quite clear to her. He says that she had talked and did then talk about some benevolent associations,

---

---

which were named, which she wished to have a share of her property after she died, but the precise amount and just what the ultimate disposition was, according to Mr. N.'s evidence, he was never able to precisely determine. Finally the deed was prepared and she came there with the defendant on the 4th of June, and it was executed and acknowledged in the presence of Mr. Gordon, who had his office in the same building, and it is due to Mr. Gordon to say that he took all the pains in performing that duty that any lawyer could be expected to take under the circumstances.

Now, Mr. N. says that he told her on that occasion that the trust that she wished the property held upon should be put in writing and that if it was not put in writing it could not be enforced; and he says that she said it mattered not; that she and Annie, the defendant, could arrange that, and she knew that Annie would do whatever she wished with it. Taking the evidence altogether, I am satisfied that she had not, at that time, in her mind, fixed a definite plan or trust for the disposition of her property, and that she expected that she would do it in the future and have it reduced to writing. In fact both Mr. N. and defendant so distinctly swear. And in this connection a suggestion of the counsel for the complainant has force. This was on the 4th of June. In July, or August, Mr. N. went off on his vacation and only visited his office occasionally. But his clerk swears that some time in the month of August, in Mr. N.'s absence, the complainant came there, inquiring for Mr. N. in considerable of excitement, and asked how he was getting along with her business. Mr. N., at that time, had no business to do for her except to write out this declaration of trust. Miss Toppin, the defendant, swears that some time after the date of the deed the terms of the trust were entirely agreed upon between her and the complainant, namely, that the property was to be for the use of the complainant during her lifetime, and at her death one-half was to go to her, Annie Toppin, and the other half was to go to four benevolent institutions in Jersey City which she named.

It is worth mentioning here that until the case came to a hearing and Mr. N. and Miss Toppin were put upon the stand the idea that this property was held subject to any trust found no

place either in the pleadings or the evidence, and from evidence, to which I shall shortly refer, the trust stated by defendant seems to have rested very lightly on her shoulders.

Now, in support of the conveyance, it may be said that she did have independent advice and that the effect of the conveyance was fully explained to her by Mr. N. But the fact remains that Mr. N., having the responsibility of his client on his shoulders, did permit her to make an absolute deed without any trust expressed either in it or signed by the grantee on a separate piece of paper, and I am entirely satisfied, I am sorry to say, that it was in the power of Mr. N. to have prevented that transaction in that shape so far as he was concerned. I do not say that the complainant might not have gone to other counsel and procured the deed to have been prepared and executed, but I do say that Mr. N. could have declined to perform that task himself or to have it done in his office.

But the great question is, did Mr. N. explain to her all the effects and consequences of that conveyance in all its aspects and all its bearings and in all directions? For I conceive that it is necessary that he should have done so in order to support the deed. Now, he has stated all that he can remember of what passed with great elaborateness and precision, and we cannot presume that he made any other explanation to her than that which he has testified to, and that, as I have said, was confined to saying to her that she could enforce nothing against Annie without a writing, and that in case anything should happen to her (the complainant), Annie would get all the property.

Now that leaves two important matters which he did not explain to her, and they were these—*first,* that in case of the marriage of the defendant in the lifetime of the complainant, she, the defendant, would possibly and probably be incapacitated from carrying out her verbally expressed intentions in favor of the complainant; and *second,* in case of Miss Toppin's death in the lifetime of complainant, the complainant would be entirely without any redress against the heirs or devisees of the defendant—she would not have even the good intentions of Miss

Toppin to rely upon. Now, I have said, that according to the evidence the terms of the trust were not agreed upon at the time the deed was executed, but remained for further consideration. We have, then, the fact that the deed was executed upon an indefinite trust and without what I conceive to be one of the requisites under the circumstances for its validity, namely, that the complainant should have been advised of the effect of Miss Toppin's marriage or death in her lifetime. The effect of the application of the principles of equity to this state of things will be considered later on.

It is due, however, to Mr. N. to say that he took the precaution to converse with Mr. Robert Davis with regard to this desire of the complainant to convey her property to the defendant, and also to write him what appears to have been an elaborate letter on the subject, setting forth the situation of the affair, with the expectation that Mr. Davis would intervene and consult with and advise the complainant as to what she should do. According to his evidence and that of the defendant, the complainant placed the utmost reliance upon Mr. Davis as a friend and counselor. She had placed her whole affairs in his hands as attorney in fact, and substantially as her guardian, so that in a sense and to a certain degree Mr. N. was justified in relying upon Mr. Davis to take care of the complainant's interest in the premises.

He was called as a witness by the defendant, but was not asked what action he took, if any, with regard to the matter of this conveyance. So far as the evidence shows, he permitted the complainant to make the conveyance without a word of caution or advice upon the subject. He swears that she told him that she was going to transfer her property to the defendant "so as to protect her [the complainant] for the balance of her life," and also stated what she wished done with it after her death, and he referred her to Mr. N. He swears he told her, "I can take care of whatever is coming in, but I am not going to bother about what you are going to do with your property or anything."

I stop now to consider another aspect of the case, and that is the subsequent conduct of the parties. I said that the trust

seemed to rest lightly on Miss Toppin's shoulders. I think the evidence warrants me in that statement. The complainant seems to have continued to live with the Toppin family on amicable terms and with entire seclusion until the 15th of July. On or about that day, according to defendant's testimony, she took the complainant to a boarding-house or hotel at Rockaway, on Long Island, and left her there. She did not herself stay with her, nor did she furnish any maid or attendant for her. She knew that she was there exposed to drink. She visited her, so she said, several times, and found her indulging in drinking. She says she warned her against it, but contented herself with a simple warning. The evidence gives us no information about the complainant, except that just mentioned, during her stay at Rockaway, which ended, as I think it clearly appears, about the 14th of August.

The history of the complainant between August 14th and 19th, as furnished by the defendant and her sister, Miss Lottie, and Mr. Miggins, who attended as deputy to Mr. Davis' duties as city collector, at the city hall, is this: That the defendant went to spend a fortnight at a place called Acra, about three miles from a railway station called Cairo, on a railway that runs northwest through the northern part of the Catskills from Catskill Landing on the Hudson, where she stayed until September 1st in company with several Jersey City people, including Mr. Davis. She left home for this place on the morning of Tuesday or Wednesday, the 13th or 14th of August, 1901, and on the same morning and after she had left, the defendant came to the Toppin house, in Sussex street, and saw Miss Lottie Toppin, who describes the visit thus:

"The next I saw of Mrs. Collins was that she came to the house the very morning that Annie left, and she was looking for Bob, as she called Mr. Davis; she came from Rockaway to the house and I told her that she [defendant] was gone up to the country. 'Well,' she says, 'if I can't see Annie, then I must see Bob.' I says, 'He has gone away, too,' and she said, 'Then Tom Miggins will do; of course he has a whole drawer full of money up there and I must have money.' She was looking for money and she had just gotten a hundred dollars shortly before that from Mr. Davis," &c.

Collins *v.* Toppin.

And after some description how she was spending her time down at Far Rockaway, the witness, Miss Lottie Toppin, proceeds:

"*Q. Then did you see her at another time?*

"*A. No, sir; I didn't see her again until I got a telephone message that she was in Brooklyn.*

"*Q.* (By the court.) *How long after that was it?*

"*A. I just couldn't say how long it was after; it seemed quite a while.*

"*Q.* (By the court.) *A few days?*

"*A. No, it was more than a few days; it probably was a few weeks.*

"*Q.* (By the court.) Well, that was about the 15th of August that she was up there; you said that your sister went up about the 12th or 13th of August and it was that day after that that she came out?

"*A. Yes, it probably was ten days or a week after that; I got this telephone message that she was in Brooklyn.*

"*Q.* Who was the telephone from?

"*A. From Mr. Miggins.*

"*Q.* What did the message tell you?

"*A. It said that Mrs. Collins—that he had gotten word from a Brooklyn police station that a woman was arrested for being drunk and disorderly in Brooklyn and that I was to go there, and he gave the number of the precinct,*" &c.

She swears she went over in a carriage and found the complainant at a police station and learned from the officer in charge that she had been picked up the night before in a sort of stupor, and that they had kept her over night and that that morning she had 'phoned to Mr. Miggins at the city hall. Mr. Miggins' account of it was that he understood that she had come up from Far Rockaway to Brooklyn and had there got drunk and was there locked up in a police cell.

The defendant swore that after she had made her last visit to the complainant at Far Rockaway, she went to Acra and then heard of the incident at the police station in Brooklyn through a slip in the newspaper. *The question was not put to her directly if she had heard anything about the movements of the defendant in the meantime, but the impression left by her evidence was to the effect that she had not, and upon that state of affairs the case was rested on both sides—*the proof being that Miss Lottie Toppin took her from Brooklyn directly to an inebriate sanitarium on the Hill in Jersey City. She stayed

two or three days, but, as we have seen, escaped, came to the Toppin house, and was from there taken to Snake Hill by Miss Toppin and Mr. Miggins.

Now, after the cause had been rested, complainant asked to have it opened upon newly-discovered evidence, which was granted. And I may say here that complainant's brother, being a mechanic, confined to his business in the city of New York, had little opportunity to trace the history of his sister during this period. When the evidence was opened again, the further testimony given was to this effect: That on Friday afternoon, August 16th, two days after her visit to the defendant's house in search of Mr. Davis for the purpose of getting money, as testified to by Miss Lottie Toppin, Mr. Spratt, a member of the New York bar, who lived with his wife in a house not far from the Toppins and who had been on friendly terms with Mr. and Mrs. Collins and knew the Toppins, came home late in the evening from his business and learned from his wife that the complainant was there at the house in a pitiable condition—in bed, sleeping or resting. He did not see her that night, but had an interview with her next morning, and she said she had come from Rockaway, but he does not state that she said when she had left Rockaway. She said she wanted to go up to the Catskills for the purpose of seeing Mr. Robert Davis. The witness went to his business in New York in the morning (Saturday) and came home about one o'clock and found her still there. He took her, at her request, to New York City, put her on the boat for Catskill, paid her fare through to Cairo and gave her $5. She had no baggage, but a paper bundle, and no money. This witness swears that she was excited—manifested symptoms of mania, but none of having been drinking—and that his wife purchased some clothing which she seemed to need in order to make her decent for traveling, and further that she stated that Mr. Miggins, at the city hall, had told her, "Go up to Spratt's and stay until over Labor day." (When, as the evidence shows, Davis and defendant were expected home.) Mr. Spratt swears that he afterwards spoke to Miggins about having sent her up to his house, but did not give Miggins' answer. It is inferable from Mr. Spratt's evidence that Mr. Miggins did not

deny it. He did, however, come on the stand subsequently and deny that he had sent her there or that he had any interview with Mr. Spratt on the subject.

Turning now to the following movements of the complainant: The proof shows that the boat she took would arrive at Catskill in the morning (Sunday) and trains ran out to Cairo frequently on weekdays, but what their runs were on Sunday does not appear, but on Sunday night, about half past ten o'clock, she arrived at the Hotel Hillcrest, at Acra, and that a Mr. Fallon, who called himself a broker of Jersey City, and who is a friend of Mr. Davis, was at the gate or entrance to the hotel grounds when she arrived; that she spoke to him and asked him where Bob was, meaning Mr. Davis; that he answered that he was not there, and that she also asked for the defendant, and he answered that she was not there; and that he called for his daughter, Miss Fallon, and she took the complainant into the parlor of the hotel, and that then he immediately called upon a Miss McNamara, of Jersey City, who was also stopping at the house and rooming in an annex or bedroom building a short distance away; that she asked what he wanted and he said, "Mrs. Collins is here," and Miss McNamara answered, "For God's sake, what is she doing here?" Witness said, "I don't know, but she wants to stay here to-night." Miss McNamara asked, "Where are you going to put her?" Witness says, "I don't know," and he brought Miss McNamara to the parlor of the hotel and she took charge of the complainant—saw that she was properly lodged. The evidence of Fallon and his daughter and Miss McNamara is that when she failed to find Mr. Davis she immediately expressed her intention to return the next morning, and arranged with Mr. Fallon to have his horse and carriage ready early in the morning to take her back to Cairo, on the way to New York. It is evident that the three witnesses mentioned, Mr. Fallon and his daughter and Miss McNamara, were unfriendly witnesses and the complainant was compelled, so to speak, to go into the enemy's camp for this evidence. The inference I draw from the evidence of Mr. Fallon and Miss McNamara was that none of them gave the complainant information as to where Mr. Davis and the defendant were. In fact, as

they all swear, Davis and the defendant were out on a late Sunday night drive with a large party from the hotel and did not return until twelve or one o'clock.

Mr. Fallon prepared his horse and wagon in the morning and took the complainant to the station at Cairo, paid her fare to New York and gave her $10. This was Monday morning, the 19th of August, and it is impossible to escape the belief that they all desired to speed the departing guest. She saw neither Mr. Davis nor the defendant, and the defendant took no pains whatever to inquire into her further movements, although she did not deny that she knew that she had been at the hotel, and, when examined on the subject, expressed entire indifference as to her welfare, and said that she was under no obligations to follow her up or to look after her.

Complainant arrived at New York that afternoon, whether by boat or train does not appear, and between five and six o'clock came out of the ferry-house at the foot of Exchange place, Jersey City, followed by a parcel of street hoodlums. She accosted a cab driver named Frank Dunn, who had a stand there, and entered his cab; by her direction she was driven to the city hall; that was found closed. Thence was driven to the corner of Third and Jersey avenue, where there was a dressmaking establishment. She entered the shop, stopped a short time and came out. From there she was driven to the abattoir, the headquarters of her late husband's business. Then, the cabman swears, he began to think she must be Martin Collins' widow. She found the abattoir closed, as the cabman seemed to infer, and from there she was driven to 124 Sussex street, the home of the Toppins. When they arrived at the curb in front of the Toppin house, according to the evidence of the cabman, Miss Lottie Toppin came out with another lady and says, "Don't fetch her in here, my mother is sick; don't fetch her in here; drive her up to Mr. Spratt's house, 309 York street." He drove her up to Mr. Spratt's house and Mrs. Collins got out, walked upstairs to the stoop, and the cabman waited there for his fare. Pretty soon Spratt came out and called him up, asked him who sent the woman there. "I told him Miss Toppin sent her there, and he says, 'What the hell business has she got sending you up

here with this woman when she is getting pay for taking care of this woman and Bob Davis has got the money?'" Mr. Spratt asked the cabman what his bill was; he told him it was $3, and Mr. Spratt did not pay it, but told him to drive her back to Toppins, but gave him no money, but intimated to him that he had told the complainant that she was to go to the Hoffman bath in New York City; that he would see Mr. Davis and get him paid; and the cabman asked Mr. Spratt how he would manage if she would not get out when he got to the Toppin house, as he was unwilling to be driving her farther about the city on mere promise of pay, and Mr. Spratt says, "You get her out." The cabman then drove her to the Toppin house, got down off the cab and went upstairs to the door and saw the mother of the Toppin sisters, and she said, "Don't fetch her in here." The cabman told Mrs. Toppin what Mr. Spratt had said, and told her he was not going to be hauling complainant around. Then he came down the steps from the house and went to the door of the cab and said, "Mrs. Collins, you better get out and go in here and go inside; they want to see you inside;" and in that way he got her out of the cab, but she says, "I won't go in there; they are robbing me; I won't go in there." And the cabman says, "I won't drive you over to any Hoffman baths, because you ain't got no money." She says, "I won't go in there." She got out of the cab and walked down the street and took a trolley that was going towards the ferry and he followed there to observe whether she took any other cab, &c., and as far as he could observe she went to the ferry, but he did not see her there. He swears that the woman was not drunk. "She acted like a crazy woman; she walked along crazy and acted crazy; she had no baggage, but her clothes had been cleaned up." (That very night, be it observed, she was picked up by the police in Brooklyn.)

The account of the cabman, which I have just given, is corroborated so far as relates to the interview at the house of Mr. Spratt. Spratt did get her out of the house by leading her to suppose she was going to the Hoffman baths, and he says he induced the cabman to drive her to the Toppins. He says in one place that he promised the cabman an extra dollar and in

another place that he gave him the dollar. The cabman says that he did not get the dollar. But, on the whole, their stories agree.

Now, Miss Lottie Toppin, called to the stand by the defendant, in answer to this evidence, swears that the complainant did come to her house that evening in the cab, and that she got out, as the cabman describes it, only she says that she, and not her mother, was present when she got out and walked down the street, and that she did speak of being robbed—not by the Toppins, but by the cabman. She says that

"Mrs. Collins opened the door of the cab, and I said, 'Hello, Collins,' and she said, 'Hello;' and I said, 'Where have you been?' She said, 'Why, I have just come from Spratts;' I said, 'What were you doing there;' she said, 'Well, I drove up from the ferry there;' I said, 'I thought you were in Rockaway;' she said, 'No, I have been up in the country.'"

She asked her where she came from; she said she came from up in the country—from Acra. "I asked her if she saw Davis; she said, 'No.'" She says she asked her to come in the house, and she refused to come in, and said she was going down to Rockaway to pack up her clothes and come home, and that she owed them money and didn't want to stay in Rockaway any longer. And then she says she walked away, and that the next morning she heard of her being locked up in Brooklyn.

She was also examined as to why she did not tell of this incident when she was on the stand before, and failed to make any satisfactory explanation of it. She excused herself on the ground that she was not asked the question, but I have already cited her evidence in that respect. So far as her evidence conflicts with that of the cabman, I believe the latter. He is impartial and uncontradicted, while Miss Lottie distinctly falsified.

It is, of course, natural that the defendant should wish to conceal this bit of newly-discovered evidence.

That these occurrences took place on the dates I have given is fixed by the fact that she was brought back from Brooklyn on Tuesday, the 20th of August, was lodged in the sanitarium,

kept there on and off for a few days, and lodged in the Snake Hill pauper asylum on the 26th of August..

Mr. Davis was not called to explain his part, whatever it was, in this affair.

Mr. Miggins swears that she did come to him on or about the 14th or 15th of August for money, and that he declined to let her have any, but denies, as I have already stated, that he sent her to Spratts.

Sheriff Davis and the defendant returned from the Catskills about September 1st, but took no measures to remove complainant from her quarters in a pauper's room, or relieve her altogether from confinement, until nearly four months had elasped, and after her brother had ascertained her whereabouts and had visited her twice, although they, well knew that such confinement was most disagreeable to her.

Bearing in mind that, according to the evidence of Mr. N., the great purpose and object which she had in making the conveyance to the defendant was that the defendant should look after her and take care of her if she should have a recurrence of insanity, we can well see that, though half demented; while wandering penniless and homeless during the last days of August, she keenly realized the treatment she was receiving from these stanch friends, and I am satisfied that, at that time, she would, so far as she had capacity, have approved the bringing of this suit to recover from the defendant her estate.

My conclusion from the whole case is this: That at the time of the conception of the idea of this conveyance and its execution the complainant was not in the possession of her complete mental faculties. She was calm and had her memory and was competent to transact the ordinary affairs of life, such as the collection of her moneys, and possibly the disbursement thereof in the ordinary way for the ordinary purposes of everyday life; yet, owing to mental disease, she was not possessed of those higher faculties involving the contemplation and weighing of different considerations, and the exercise of judgment thereon; and she had not mental power "clearly to discern and discreetly

Collins *v.* Toppin.

to judge of all those matters and things which enter into a proper disposition of her property."

The conveyance in question was wholly without consideration and was intended to be testamentary in its character, but it took immediate effect and was irrevocable, and, in connection with the transfer of her personalty to Mr. Davis, denuded her of all her property without a scratch of a pen to show for it. Such a transaction, under the circumstances, no matter how honest and well intentioned the defendant may have been, was highly improvident and quite unnecessary, and such as no experienced lawyer or faithful business friend of sound judgment should be willing that a person, situated as was the complainant, should execute. The parties who surrounded complainant at that time, to wit, Mr. Davis and the defendant and family, occupied confidential relations toward her. She was subjected to the constant and uninterrupted influence of the chief beneficiary, the defendant, and her near relatives. What passed between them on the subject we know not, except what comes from the lips of the interested party, the defendant and her sister. The complainant was laboring under a wholly unfounded and unreasonable belief as to the conduct of her only brother and natural protector and his family, and there is reason to believe that the defendant was in part responsible for that unfounded belief.

I must assume that the complainant was warned by the party who was acting as her counsel of the importance of having at least her life right in the property thoroughly assured to her by a written declaration of trust, executed by the grantee. She was permitted to make the conveyance without having that declaration of trust executed, and while it is fairly inferable from the evidence that counsel did say to her that it should be signed and executed at or before the execution of the conveyance, yet I cannot avoid believing that the complainant entertained the idea that she could have it done afterwards quite as well as then.

The evidence indicates that she entertained the intention of having a declaration of trust executed at a later day.

Finally, quite as important as any of these matters is this: She was not informed by counsel that the marriage or death of

the defendant in her, the complainant's, lifetime would in one case probably embarrass her, and in the other case absolutely debar her from the benefit of any confidence she might repose in the disposition of the defendant to fulfill and perform the verbal trust which the parties understood was attached to the conveyance.

Under these circumstances, I think the law is quite clear that the deed must be set aside.

There is a well-considered line of cases in this state which lead, I think, to that result. I refer to *Garnsey* v. *Mundy, 9 C. E. Gr. 243; Mulock* v. *Mulock, 4 Stew. Eq. 594; Martling* v. *Martling, 2 Dick. Ch. Rep. 122* (at *p. 132*) ; *Hall* v. *Otterson, 7 Dick. Ch. Rep. 522; Lovett* v. *Taylor, 9 Dick. Ch. Rep. 311* (at *p. 325*), and *White* v. *White, 15 Dick. Ch. Rep. 104* (at *p. 115*).

And last, and perhaps most important of all, because affirmed by the court of errors and appeals, the very recent case of *Thorp* v. *Smith, 18 Dick. Ch. Rep. 70.* The last clause of the opinion, at the bottom of *p. 92* and top of *p. 93,* was adopted by the court of errors and appeals in its opinion. *20 Dick. Ch. Rep. 400.*

In *Mulock* v. *Mulock,* Vice-Chancellor Van Fleet distinctly holds that where a voluntary conveyance in the nature of a family settlement is made, which it clearly appears does not contain all the terms of the settlement, the deed cannot be reformed, but must be wholly set aside. Here the proof of the precise terms of the trust rests wholly in the evidence of the defendant, upon which alone I would be unwilling to rely if it were proper for me to attempt the task of establishing it. I am, however, not at liberty, nor am I disposed to attempt it.

The result is that there should be a decree setting aside the conveyance, with costs, and also for an accounting of the rents and profits.